IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SANDRA L. PALLATTO, | : | CIVIL ACTION - LAW |
| | : | |
| Plaintiff, | : | NO: 11-1206 |
| | : | |
| v. | : | |
| | : | |
| WESTMORELAND COUNTY | : | |
| CHILDREN'S BUREAU, | : | |
| | : | |
| Defendant | : | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

AND NOW, comes the Plaintiff, Sandra Pallatto, by and through her counsel, Susan N. Williams, Esq., and Adam R. Gorzelsky, Esq. and files the within Brief in Opposition to Defendant's Motion for Summary Judgment, in support thereof alleging as follows:

**COUNTERSTATEMENT OF THE CASE**

The Defendant filed a Concise Statement of Material Facts ("CSMF") in support of its Motion for Summary Judgment. *See* (CSMF, Doc. 37.) Ms. Pallatto has filed a counterstatement of facts ("CSMF Response") in response to the Defendant's CSMF. Contained within that response is a separate section setting forth additional facts necessary to determine the instant motion. Accordingly, all citations to the "CSMF Response" refer to the paragraphs listed under that section. All citations to the "CSMF" refer to the Defendant's list of facts and the responses to those facts filed by Ms. Pallatto.

For the sake of judicial economy, rather than reciting the facts provided in the CSMF and CSMF Response, Ms. Pallatto hereby incorporates these documents by reference.

1

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007)  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 2d 202 (1986); s*ee Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof.") (citing *Anderson*, 477 U.S. at 248; *Celotex Corp.*, 477 U.S. at 322-23).

## ARGUMENT

**I.   Ms. Pallatto has presented sufficient evidence from which a reasonable jury could find that the Defendant's agents created a hostile environment in retaliation for her exercising her rights pursuant to the Family and Medical Leave Act[1]**

The Family and Medical Leave Act ("FMLA") prohibits an employer from "use[ing] the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c).  In bringing such a retaliation claim, a plaintiff is required to show that "(1) he or she is protected under the FMLA, (2) he or she suffered an adverse employment action, and (3) the adverse action was causally related to the plaintiff's

---

[1] In its Motion, the Defendant also seeks judgment pursuant to a FMLA interference claim. Such a claim was not alleged in Ms. Pallatto's Complaint and there is no intent to pursue such a claim at this time.

2

exercise of his or her FMLA rights." *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508 (3d Cir. 2009) (citation omitted).

In regard to the identification of an adverse employment action, the Court of Appeals for the Third Circuit has recognized that this prong can be fulfilled via a claim for retaliatory harassment. *Crosby v. State Corr. Inst. Greensburg*, 2010 U.S. Dist. LEXIS 71987, *18-19 (W.D. Pa. July 19, 2010) (citing *Jensen v. Potter*, 435 F.3d 444 (3d Cir. 2006); *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. Pa. 2006); *Hare v. Potter*, 220 Fed. Appx. 120 (3d Cir. Pa. 2007)). In such cases, the Third Circuit has adopted the *Burlington Northern* "materially adverse" standard rather than the "severe and pervasive" standard that usually is reserved for claims alleging the creation of a hostile work environment. *Crosby*, 2010 U.S. Dist. LEXIS 71987 at *18-19 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *Moore*, 461 F.3d at 341-42; *Hare*, 220 F. App'x at 131-32.)[2]

As stated by the Supreme Court in *Burlington*, an employment action becomes retaliatory when it is "materially adverse," meaning that it would dissuade a reasonable worker from engaging in a protected activity such as making a charge of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. at 68. "[B]ecause 'it is often difficult to determine the motivations of an action[,] . . . [the] discrimination analysis must concentrate not on individual incidents, but on the overall scenario.'" *Hare*, 220 F. App'x at 132 (quoting *Jensen*, 435 F.3d at 450.) For instance, in *Hare*, although the defendant had offered various plausible nondiscriminatory explanations for discipline levied at the plaintiff, the court held that "while we

---

[2] Given the similar language regarding retaliation contained within anti-discrimination statutes such as Title VII, the ADA, the ADEA, and the FMLA, courts utilize the same tests for each statute. *See Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. Pa. 1996); *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir. 1998); *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001).

3

agree that any one of the incidents explained above, standing alone, does not constitute adverse conduct or demonstrate retaliatory animus, the incidents, when considered together, could." *Id*.

Finally, in regard to the third prong of the analysis, a causal connection usually can be shown in one of two ways: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). If neither of these methods can be established, a plaintiff "must show that from the 'evidence gleaned from the record as a whole' the trier of the fact should infer causation." *Id*. (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)).

In the instant case, the Defendant does not appear to contest that Ms. Pallatto engaged in a protected activity under the FMLA by seeking and receiving intermittent FMLA leave. *See* (Doc. 36 at 16-18.) Instead, the Defendant focuses on the discipline and scheduling changes to which Ms. Pallatto was subjected, arguing that such actions did not constitute adverse employment actions because "Pallatto's employment was not terminated, she was not demoted, she was not transferred, and her pay and benefits were not reduced." (*Id*. at 16.) The Defendant further argues that these actions were performed pursuant to legitimate nondiscriminatory motives. (*Id*. at 17-18.)

In regard to the Defendant's first argument, as was discussed at length herein, an adverse employment action can come in the form of retaliatory harassment. *Crosby*, 2010 U.S. Dist. LEXIS 71987 at *18-19. Ms. Pallatto intends to present each of these instances as part of a totality of circumstances that evidence a pattern of harassment. As such, the fact that none of the listed actions alone constitute a termination, demotion, transfer, or change in benefits, is not conclusive of the issue.

In regard to the Defendant's second argument, it is first important to note that the Defendant has chosen to ignore a considerable amount of evidence that has been presented in support of the assertion that Ms. Pallatto was subjected to constant retaliatory harassment. Prior to 2008, it is undisputed among both parties that Ms. Pallatto was subjected to numerous disciplinary actions for her use of sick time. (CSMF at ¶¶ 21-22.) This discipline was levied even though Ms. Pallatto consistently made her supervisors aware of her symptoms and provided doctor's notes, MRIs, pill bottles, and other medical information to support her absences. (CSMF Response at ¶¶ 1-2.) Furthermore, despite providing this information, Human Resources Director Charles Dominick constantly harassed Ms. Pallatto about what was deemed to be an abuse of sick time. (*Id.* at ¶ 3.)

After becoming aware of her ability to seek protection from the FMLA in 2008, Ms. Pallatto was approved for intermittent leave and presented this paperwork to Mr. Dominick. (*Id.* at ¶¶ 17-18.) Upon presentation, Mr. Dominick expressed how "convenient" it was that she was submitting her paperwork that day and angrily informed her that the issue "was not over." (*Id.* at ¶ 18.) Coupled with the previous resistance to her usage of sick time, this statement certainly could be seen by a reasonable jury to constitute anger toward the fact that Ms. Pallatto's need to utilize sick time now was to be protected by law. Following this exercise of Ms. Pallatto's FMLA rights, the hostility on the part of Defendant's agents became readily apparent.

Ms. Pallatto suffered from constant actions that can be deemed harassment at the hands of her immediate supervisor, Michelle Bianco. She frequently brought Ms. Pallatto into her office to tell her that she was tired of Ms. Pallatto missing work and was tired of having to perform Ms. Pallatto's job. (*Id.* at ¶ 5.) When Ms. Pallatto would return from work following a sick day, Ms. Bianco often would say "you're not sick, why not just quit and find a job you can

5

do." (*Id*. at ¶ 16.)  She constantly was changing Ms. Pallatto's schedule without informing her. (*Id*. at ¶ 6.)  She would cancel visits on Ms. Pallatto's behalf even when these were visits that Ms. Pallatto could attend.  (*Id*. at ¶ 7.)  She changed the rules in regard to Ms. Pallatto on a daily basis. For instance, Ms. Bianco would change whether Ms. Pallatto could do scheduled or unscheduled visits, would make her include much more detailed information about client visits on her schedule, and would constantly change how her paperwork was to be done.  (*Id*. at ¶¶ 8-9.)

Ms. Bianco constantly would pull Ms. Pallatto from the field, yet complain that her visits were not being completed.  (*Id*. at ¶ 10.)  She also would go through Ms. Pallatto's files and contact her clients.  (*Id*. at ¶ 11.)  Despite requests and despite the fact that this was an agency-wide practice, Ms. Bianco would not allow other caseworkers to assist Ms. Pallatto in completing her visits. (*Id*. at 12.)  Ms. Pallatto attempted to overcome this issue by doing visits before school or when kids were off, but was told by Ms. Bianco that she was not permitted to do that even though other caseworkers were doing it.  (*Id*. at ¶ 13.)  Ms. Bianco would return work to Ms. Pallatto to be redone on the day that it was due for grammar corrections, and by the time the corrections were done, she was told that the paperwork was late.  (*Id*. at ¶ 15.)  Ms. Pallatto was the only caseworker required to submit map quest print-outs for her mileage reimbursements and once actually was criticized by Ms. Bianco for purchasing lunch that was within her prescribed meal stipend.  (*Id*. at ¶¶ 21-22.)  Even more tellingly, in or around 2009, Ms. Pallatto overheard Mr. Dominick and Ms. Bianco discussing ways to write up Ms. Pallatto in order to bring her into the office for discussions.  (*Id*. at ¶ 14.)

Together, all of these incidents paint a reasonable picture of a supervisor targeting an employee for any and all possible issues. Given the frequent comments about Ms. Pallatto's

sickness and missed days of work, it is reasonable to conclude that this hostility resulted from Ms. Pallatto's ability to utilize FMLA time. All of this hostility culminated with the intense scrutiny related to Ms. Pallatto's request not to work past 4:00 p.m.

In or around 2010, Ms. Pallatto informed Ms. Bianco that she no longer could work past 4:00 p.m. because of her medical condition. (*Id*. at ¶ 25.) She explained that she had tried it for a year and was tired, sore, falling asleep behind the wheel, and could not take her medication. (*Id*. at ¶ 26.) In order to complete her appointments, she offered to see the children before school started and had discussed this with the parents or foster parents who agreed. (*Id*. at ¶ 27.) Other caseworkers were permitted to make such visits. (*Id*. at ¶ 28.) Although Ms. Bianco initially approved of this arrangement, Charles McCallen and Shara Saveikis would not allow it. (*Id*. at ¶ 29.) Ms. Pallatto visited her treating physician, Dr. Scheler, to request a note indicating that she could not work past 4:00 p.m. (*Id*. at ¶ 30.) Apparently misunderstanding the request, Dr. Scheler simply noted that Ms. Pallatto could not work more than 37.5 hours per week. (*Id*. at ¶ 31.) Following submission, Ms. Pallatto never was informed that this note was insufficient to support her claim of being unable to work past 4:00 p.m. (*Id*. at ¶ 32.)

On or about February 5, 2010, she received a letter explaining that if she could not complete all of her monthly visits within the first two weeks of the month, her schedule would be changed from 10:30 a.m. to 6:00 p.m. (*Id*. at ¶ 33.) Ms. Pallatto completed all but one of her scheduled monthly visits for March within the first two weeks. (*Id*. at ¶ 34.) On or about March 12, 2010, Ms. Pallatto attended a meeting with Ms. Bianco, Mr. McCallen, Mr. Dominick and Ms. Saveikis to discuss the issue of her working past 4:00 p.m. (*Id*. at ¶ 35.) Despite explaining that all but one of her clients had been seen within two weeks, Ms. Pallatto was informed that her schedule would be changed from 10:30 to 6:00. (*Id*. at ¶ 36.) The meeting concluded when Mr.

7

Dominick jumped out of his seat, slammed his hands on the table, moved close to Ms. Pallatto's face, and shouted "do you understand what I said? Answer me!" (*Id*. at ¶ 37.)  Ms. Pallatto suffered a major nervous breakdown after this incident.  (*Id*. at ¶ 38.)

Viewing all of this evidence as a whole, it is reasonable to conclude that Ms. Pallatto was treated in a manner that would dissuade a reasonable employee from exercising her FMLA rights.  *Burlington*, 548 U.S. at 68.  Furthermore, it is reasonable to conclude that this treatment was causally related to the exercise of these rights. Prior to receiving FMLA approval, Ms. Pallatto faced frequent scrutiny regarding sick leave. Upon presenting her approval, she was met with hostility and an unequivocal proclamation that the issue was not over. From that point forward, the sheer amount and nature of the comments and performance-related scrutiny directed at Ms. Pallatto certainly could lead a reasonable jury to conclude that the agents of the Defendant, who had lost their ability to discipline Ms. Pallatto for missing work, sought to push her toward a resignation via constant harassment. *DeFlaminis*, 480 F.3d at 267.  This goal ultimately was accomplished by way of Mr. Dominick's wholly inappropriate display of anger.

Much like the case in *Hare*, although plausible support can be elicited in favor of some of the decisions to discipline Ms. Pallatto, the volume of such discipline can be seen by a reasonable jury as an attempt to target Ms. Pallatto.  *Hare*, 220 F. App'x at 132.  Furthermore, Ms. Pallatto's testimony indicates that she was disciplined in a manner that differed from other caseworkers. For instance, Ms. Pallatto explained that although all caseworkers had difficulty keeping their dictations up to date, Ms. Bianco constantly harassed Ms. Pallatto about her dictations.  (CSMF Response at ¶ 23.)  The Defendant has not presented any tangible evidence to disprove this statement.

While a number of such examples can be gleaned from Ms. Pallatto's testimony and from her responses to the Defendant's CSMF, the simple fact remains that each incident was merely a part of the total picture that must be examined by a reasonable jury. When such a jury examines the record as a whole, it will be reasonable to conclude that, as a result of exercising her FMLA rights, Ms. Pallatto was targeted and harassed in a manner that would dissuade a reasonable person in her position. *Burlington*, 548 U.S. at 68. As such, a grant of summary judgment on this issue is inappropriate.

**II. Ms. Pallatto has presented sufficient evidence from which a reasonable jury could conclude that she suffered discrimination and a hostile work environment because she suffered from a disability as defined by the ADA**

The Defendant sets forth a number of arguments in support of its request for summary judgment on Ms. Pallatto's ADA discrimination claim. Each argument is addressed in turn.

**A. Ms. Pallatto suffers from an impairment that qualifies as a disability pursuant to the Americans with Disabilities Act Amendments Act ("ADAAA")**

The Defendant first argues that Ms. Pallatto does not suffer from an impairment as defined by the ADA because she cannot show that her impairment "substantially limited a major life activity." (Doc. 36 at 19.) In support of this argument, the Defendant relies upon a number of cases that fall within the lineage of *Toyota Motor Manufacturing v. Williams* of, 534 U.S. 184, 198 (2002). (*Id*. at 19-20.) This reliance clearly is misplaced as the passage of the ADAAA in 2008 "explicitly rejected *Toyota* and *Sutton* in an effort to promote a less restrictive interpretation of 'disability' under the ADA. *Fleck v. WILMAC Corp.*, 2011 U.S. Dist. LEXIS 54039, *12 (E.D. Pa. May 19, 2011). A reading of the ADAAA and the accompanying regulations further explains the intent of Congress.

The enactment of the ADAAA of 2008, which took effect January 1, 2009, significantly expanded the coverage of the ADA. First and foremost, the post-amendment ADA continues to

9

state that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 USCS § 12112(a).  A disability is defined as "A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 USCS § 12102(1).  Major life activities include, but are not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id*. at § 12102(2)(A).

Unlike the pre-amendment ADA, the current statute now states the following in regard to the definition of the term disability:

> (A) The definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act.
> (B) The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.
> (C) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.
> (D) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

42 USCS § 12102(4).  Furthermore, the EEOC regulations in regard to the post-amendment ADA explain that:

> the definition of 'disability' in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA. The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability. The question of whether an individual meets the definition of disability under this part should not demand extensive analysis.

29 CFR 1630.1 (c)(4).  Under this framework, there is little question that Ms. Pallatto's impairment meets the definition of a disability under the ADA.

The Defendant argues that Ms. Pallatto "proffers only self-serving claims regarding medical symptoms, conditions, and her desire not to work after 4:00 pm." (Doc. 33 at 20.) Although the Defendant does not explain why the self-reporting of symptoms is insufficient to support a claim under the ADA, the Defendant also ignores the medical documentation of which Defendant's agents became aware. Ms. Pallatto has testified that she suffered from symptoms of frequent migraines, difficulty sleeping, fatigue, and pain that prevented her from working upon their occurrence.  (CSMF Response at ¶ 1.)  When she was forced to work past 4:00 p.m., she was so sore and tired that she actually was falling asleep behind the wheel.  (*Id*. at ¶ 26.)

In addition to this testimony, the medical paperwork submitted pursuant to Ms. Pallatto's FMLA application outlines the extent of these symptoms.  *See* (Defendant Appendix Ex. Z, Doc. 38-26.)  Specifically, the paperwork states that Ms. Pallatto suffers from migraines that would leave her unable to work or to leave work, sleep apnea that leaves her drowsy or fatigued during the work day thus leaving her unable to perform her job, and restless leg syndrome.  (*Id*. at 1.) The paperwork further explains that Ms. Pallatto is unable to perform her work when the "symptoms of migraine or drowsiness occur."  (*Id*. at 2.)

All of this evidence combined indicates that her symptoms, which were formally diagnosed in 2009 as being caused by lupus, substantially limit numerous major life activities such as performing manual tasks, sleeping, walking, reading, concentrating, thinking, and working when presenting.  42 USCS § 12102(2)(A).  Even though Ms. Pallatto could work when not suffering from these symptoms, "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."  42 USCS §

11

12102(4)(D). Given this evidence and Congress's expressed intention to construe the definition of a disability in favor of broad coverage, there is no question that Ms. Pallatto suffers from an ADA defined disability. *Id*. at § 12102(4)(A).

The Defendant puts forth a final argument, contending that Ms. Pallatto is not a qualified individual with a disability because of her "ongoing failure to perform fundamental work duties, and her ongoing noncompliance with policies and regulations." (Doc. 36 at 21.) A qualified individual is defined as an individual who "*with or without reasonable accommodation*, can perform the essential functions of the employment position that such individual holds or desires." 42 USCS § 12111(8) (emphasis added).

The Defendant utterly has failed to identify the essential functions of Ms. Pallatto's position and, to the extent that such functions can be gleaned from the record, have failed to establish that Ms. Pallatto has not fulfilled those functions or would not have been able to fulfill those functions with a reasonable accommodation. The Defendant's failure to accommodate Ms. Pallatto is addressed fully herein at Part II.B. To the extent that the Defendant claims that Ms. Pallatto was having difficulty completing tasks that were essential to her position, these accommodations would have provided the necessary relief. Nevertheless, it should be noted that Ms. Pallatto performed her duties as a caseworker with the same symptoms from Lupus since 1996. In other words, it is difficult to ascertain how Ms. Pallato could remain employed for fourteen years if she was unable to perform the essential functions of her position.

Ultimately, the Defendant has not met its burden to show as a matter of law that Ms. Pallatto is not a qualified individual, especially under the post-amendment ADA.

**B. Ms. Pallatto made the Defendant's agents aware of her disability and requested a number of reasonable accommodations that were denied**

The Defendant next contends that "when she finally received a medical diagnosis, Pallatto did not inform WCCB that she had a disability and did not ask WCCB to accommodate any disability." (Doc. 36 at 20.) This assertion is patently false. In addition to making the Defendant's agents consistently aware of her pre-diagnosis symptoms, the Defendant itself even acknowledges that she made its agents aware of her diagnosis of Lupus. (CSMF at ¶ 43.) Furthermore, Ms. Pallatto requested numerous reasonable accommodations that were denied by the Defendant's agents without a valid reason.

Discrimination can occur under the ADA when an employer fails to make "accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 USCS § 12112(a)(5)(A). A reasonable accommodation could include "[j]ob restructuring; part-time or modified work schedules." 29 CFR 1630.2(o)(ii). "To determine the appropriate reasonable accommodation it may be necessary for the *covered entity* to initiate an informal, interactive process with the individual with a disability in need of the accommodation." *Id*. at 1630.2(o)(3) (emphasis added).

As the Third Circuit has made clear, "an employer, having received adequate notice of an employee's disability and desire for accommodations, cannot fail to engage the employee in the interactive process of finding accommodations, increase the disabled employee's job responsibilities, and then simply document the employee's failures." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319 (3d Cir. 1999). In order to prove such a claim for discrimination, a plaintiff must show that "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a

good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Id*. at 19-20.

First and foremost, Ms. Pallatto made her supervisors aware that constant stress worsened her lupus symptoms and, as such, made the reasonable request that the harassment outlined above cease. (CSMF Response at ¶ 24.) While the Defendant will respond that its agents viewed much of the discipline as necessary, the constant derogatory comments about Ms. Pallatto missing work and her illness in general were unwarranted and generally affected her ability to concentrate on her work. Furthermore, it can be shown that additional reasonable accommodations would have eliminated the need for any such discipline in the first place.

Ms. Pallatto testified that she requested assistance from other caseworkers to complete her caseload, but that Ms. Bianco consistently denied these requests. (*Id*. at ¶ 12.) Exhibiting the reasonableness of this request, Ms. Pallatto also testified that caseworkers frequently assisted one another in such a manner. (*Id*.) The Defendant has not set forth any evidence explaining why this request could not be accommodated. Granting this accommodation would have relieved some of the pressure placed upon Ms. Pallatto as a result of her need to miss work when she was ill.

On a similar note, had the Defendant's agents engaged in the mandated interactive process with Ms. Pallatto upon notice of her disability, the possibility of reducing Ms. Pallatto's caseload could have been discussed. The Defendant has not set forth any documentation or laws requiring a caseworker to carry a specific amount of cases. Accordingly, this is the exact type of "[j]ob restructuring; part-time or modified work schedules" that was envisioned in the ADA regulations.  29 CFR 1630.2(o)(ii). A lighter schedule would have allowed Ms. Pallatto to meet all of her appointments and keep her dictations completely up to date, while still maintaining the

14

ability to miss work when her symptoms arose. The Defendant was aware of Ms. Pallatto's disability, was aware of her requests for scheduling-related accommodations, yet failed to explore any possible accommodations, let alone the reasonable option of a reduction in case load. *Taylor*, 184 F.3d at 319.  Such a lack of bad faith constitutes disability discrimination.  *Id*.

Finally, the most obvious failed accommodation in this matter relates to Ms. Pallatto's request not to work past 4:00 p.m. Ms. Pallatto made her supervisors aware that she could not work past this time and suggested the reasonable solution of beginning work earlier in order to see her children in their homes before school.  (CSMF Response at ¶¶ 26-27.)  Ms. Pallatto received approval for this arrangement from the parents or guardians of the children and other caseworkers were permitted to make such visits.  (*Id*. at ¶¶ 27-28.)  Despite these realities, Ms. Pallatto was denied this request without explanation. The only explanation provided at this time by the Defendant for this denial is that the request was without medical support and that the request "would have been inconsistent with WCCB's mission to protect children." (Doc. 26 at 20.)

In regard to the first argument, Ms. Pallatto did in fact receive medical documentation that the Defendant now claims was insufficient. However, following submission of this documentation, Ms. Pallatto never was informed that this information was insufficient to support her claim of being unable to work past 4:00 p.m.  (*Id*. at ¶ 32.)  As such, rather than informing Ms. Pallatto that additional documentation was necessary, the Defendant now attempts to utilize this miscommunication as a sword. Such an argument simply is in bad faith.

In regard to the second argument, it appears as though the Defendant has sought to support this contention through reliance on statutory law requiring children to be seen in their homes every month.  (Doc. 36 at 9 n.2.)  Based upon this law, the Defendant argues that "it was

necessary for every WCCB caseworker, including Pallatto, to work after 4:00 pm, especially during the school year . . . ." (*Id* at 9.)  However, as Ms. Pallatto indicates through her testimony, her families were amenable to visits before rather than after the school day.  (CSMF Response at ¶ 27.)  As such, it is difficult to ascertain how Ms. Pallatto's requested accommodation could run afoul of any child welfare concerns.

Ultimately, not only did the Defendant's agents deny Ms. Pallatto's accommodation, they actually punished her by threatening to change and ultimately changing her schedule to force her to work past 4:00 p.m.  (*Id*. at ¶¶ 33-36.)  Such treatment runs completely contrary to the express purposes of the ADA.

In the end, Ms. Pallatto has presented ample evidence from which a reasonable jury could conclude that she made the Defendant's agents aware of her disability, that she made the agents aware of necessary reasonable accommodations, and that the Defendant utterly failed to provide these accommodations or even to engage in the interactive process. As such, a reasonable jury could find that the Defendant discriminated against Ms. Pallatto in this manner.

**C. Ms. Pallatto was subjected to a hostile work environment because of her disability**

The Supreme Court has recognized that the ADA and Title VII have virtually identical language, thus creating an action for hostile work environment.  *Walton v. Mental Health Ass'n*, 168 F.3d 661, 666 (3d Cir. 1999) (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 180 (1989).  In order to raise a successful claim for a hostile work environment under the ADA, a plaintiff must show that "[she] is a qualified individual with a disability under the ADA; 2) she was subject to unwelcome harassment; 3) the harassment was based on her disability or a request for an accommodation; 4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and 5) that [the

Defendant] knew or should have known of the harassment and failed to take prompt effective remedial action." *Walton*, 168 F.3d at 667.

Much of the evidence and reasoning supporting the establishment of a hostile work environment under the ADA has been addressed herein pursuant to Ms. Pallatto's FMLA retaliation claim. *See* supra Part I. In essence, the hostility towards Ms. Pallatto's exercise of her FMLA rights is part and parcel of a general disdain for her medical condition and its accompanying complications. However, in addition to this evidence of harassment and inequitable treatment, the previously outlined failures to accommodate further exhibit the hostility to which Ms. Pallatto was subjected.

The Defendant relies heavily on the notion that Ms. Pallatto "was the subject of numerous legitimate disciplinary, supervisory, and remedial measures that were implemented because Pallatto was not performing critical aspects of her job." (Doc. 36 at 22.) Essentially, the Defendant continues to argue that Ms. Pallatto's alleged deficiencies warranted this intense scrutiny. In reality, it exemplifies the attitude of the Defendant's agents towards Ms. Pallatto's impairment.

Rather than recognizing that Ms. Pallatto was having difficulties because of an impairment and discussing ways to accommodate these difficulties, the Defendant's agents established an alternative discernible pattern of electing harassment and discipline. Prior to her application for FMLA protection, instead of discussing the option for Ms. Pallatto to utilize the FMLA, the Defendant's agents elected to discipline her repeatedly for sick leave abuse. Instead of discussing the possibility of receiving help with her cases or receiving a reduction in her caseload, Ms. Pallatto was disciplined and harassed about failing to keep her dictations and visits up to date. Rather than discussing alternatives to working past 4:00 p.m., including the

acceptance of an arrangement that was requested by Ms. Pallatto and agreed upon by her clients, the Defendant's agents not only refused the request but actually altered her schedule to require her to work past 4:00 p.m.

Ultimately, the Defendant's agents constantly displayed their preference to "simply document the employee's failures" rather than work with Ms. Pallatto to develop a plan to cure any perceived deficiencies. *Taylor*, 184 F.3d at 319.  In essence, a reasonable jury could find that the discipline and remedial measures were not necessary and instead were a product of the Defendant's continued hostility toward the fact that Ms. Pallatto was disabled.  These measures, when taken into consideration with the remainder of the evidence outlined in Part I, establish an environment that was "sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment." *Walton*, 168 F.3d at 667.  Ms. Pallatto faced constant scrutiny of her work, consistently was criticized when she missed a day of work due to illness, and ultimately was screamed at by the Director of Human Resources because of her physical inability to work past 4:00 p.m. From an objective standpoint, such an environment is both severe and pervasive. From a subjective standpoint, the hostility ultimately forced Ms. Pallatto into retirement.

For all of these reasons, it is respectfully submitted that the Defendant's Motion for Summary Judgment on this issue must be denied.

### III.   Ms. Pallatto was subjected to a constructive discharge under both the FMLA, ADA, and PHRA

A constructive discharge occurs when an "employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 887 (3d Cir. 1984).  Some factors that may indicate the presence of a constructive discharge are "(1) threat of discharge; (2) suggesting or

encouraging resignation; (3) a demotion or reduction of pay or benefits; (4) involuntary transfer to a less desirable position; (5) alteration of job responsibilities; and (6) unsatisfactory job evaluations." *Lebofsky v. City of Philadelphia*, 394 Fed. Appx. 935, 939 (3d Cir. 2010) (citing *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993)).

As has been discussed thoroughly throughout the instant brief, Ms. Pallatto has alleged sufficient evidence from which a reasonable jury could conclude that she was subjected to a constructive discharge. First and foremost are the constant criticism, discipline, and harassing comments that can be viewed by a reasonable jury as an attempt to target Ms. Pallatto. In addition, Ms. Pallatto testified that her direct supervisor consistently told her that she should simply quit and take a job that she actually can perform. (CSMF Response at ¶ 16.); *Lebofsky*, 394 Fed. Appx. at 939.  Ultimately, her job was altered specifically to require her to work past 4:00 p.m.; a feat that she was unable to perform physically. When she protested this arrangement, she faced a verbal assault at the hands of the Director of Human Resources that led to a nervous breakdown and a medically supported inability to return to work. (CSMF Response at ¶¶ 37-39.)  A reasonable jury could find these circumstances sufficient to satisfy the requirements of a constructive discharge.

The Defendant apparently also attempts to question the causal connection between the conduct of its agents and Ms. Pallatto's inability to return to work, citing a myriad of health issues that developed following the incident on March 12, 2010. (Doc. 36 at 24-26.)  The simple fact of the matter is that Ms. Pallatto never returned to work following the incident with Mr. Dominick and testified that her doctored warned her that she could end up committed to a mental hospital if she attempted a return to work.  (CSMF Response at ¶¶ 38-39.)  Based upon this

19

timing and all of the facts alleged throughout this brief, a reasonable jury certainly could conclude that her treatment at work was causally connected to her inability to return to work.

Accordingly, it is respectfully submitted that the Defendant's Motion for Summary Judgment on this issue must be denied.

## CONCLUSION

For all of the reasons expressed herein, it is respectfully requested that this Court deny the Defendant's Motion for Summary Judgment on all issues.

Respectfully Submitted,

s/Susan N. Williams, Esq.
Susan N. Williams, Esq.
PA ID # 40077

s/Adam R. Gorzelsky, Esq.
Adam R. Gorzelsky, Esq.
PA ID # 309094

Williams Law Offices
101 North Main Street, Suite 102
Greensburg PA 15601
(724) 838-8110
(724) 838-8115 (fax)
Attorneys for Plaintiff