IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SANDRA L. PALLATTO**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:11cv1206 |
| | ) | **Electronic Filing** |
| **WESTMORLAND COUNTY** | ) | |
| **CHILDREN'S BUREAU** a local agency | ) | |
| of Westmoreland County, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Sandra Pallatto ("Plaintiff") commenced this action against her former employer,
Westmoreland County Children's Bureau ("Defendant") seeking redress for discrimination based
on a disability and retaliation. Plaintiff advances federal and state law claims for disparate
treatment and hostile work environment and a federal claim for retaliation. On September 30,
2013, the court issued an order denying defendant's motion for summary judgment. This
opinion is issued in support of that ruling.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted
if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and
disclosure materials on file, and any affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a matter of law." Summary judgment
may be granted against a party who fails to adduce facts sufficient to establish the existence of
any element essential to that party's claim, and upon which that party will bear the burden of
proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial
burden of identifying evidence which demonstrates the absence of a genuine issue of material

fact. When the movant does not bear the burden of proof on the claim, the movant's initial

burden may be met by demonstrating the lack of record evidence to support the opponent's

claim. National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992).

Once that burden has been met, the non-moving party must set forth "specific facts showing that

there is a genuine issue for trial," or the factual record will be taken as presented by the moving

party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v.

Zenith Radio Corp., 475 U.S. 574 (1986) (quoting Fed.R.Civ.P. 56 (a), (e)) (emphasis in

Matsushita). An issue is genuine only if the evidence is such that a reasonable jury could return

a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there

is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. The non-

moving party "must present affirmative evidence in order to defeat a properly supported motion"

and cannot "simply reassert factually unsupported allegations." Williams v. Borough of West

Chester, 891 F.2d 458, 460 (3d Cir. 1989). Nor can the opponent "merely rely upon conclusory

allegations in [its] pleadings or in memoranda and briefs." Harter v. GAF Corp., 967 F.2d 846

(3d Cir. 1992). Likewise, mere conjecture or speculation by the party resisting summary

judgment will not provide a basis upon which to deny the motion. Robertson v. Allied Signal,

Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990). If the non-moving party's evidence merely is

colorable or lacks sufficient probative force summary judgment must be granted. Anderson, 477

U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1362

(3d Cir. 1992), cert. denied, 113 S. Ct. 1262 (1993) (although the court is not permitted to weigh

facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the

evidence).

The record as read in the light most favorable to plaintiff establishes the background set forth below. In 1995 plaintiff was hired by defendant as a substitute caseworker and became full time later that year. As a caseworker plaintiff investigated allegations of child abuse and neglect, and took appropriate action to protect the safety and welfare of children. Her duties included conducting home visits and parent and child interviews, determining the need for protective services, maintaining contact with service providers, preparing court petitions and motions, testifying at hearings and maintaining case records.

From 1997 until her retirement in May of 2010, plaintiff repeatedly was disciplined. From 1997 until 2005, most of the disciplinary measures related to plaintiff's failure to 1) maintain case files and keep up with her dictation, 2) meet or maintain contact with children and 3) follow agency procedures and conform to agency standards. Plaintiff also was reprimanded for her accountability in the field and for making unannounced visits to children's homes when the family was absent.

In May of 2005, defendant changed its policy concerning unannounced visits. Defendant required all caseworkers to schedule client visits and obtain approval from a supervisor. Nevertheless, caseworkers continued to make unannounced visits without the permission of a supervisor especially when the schools were not in session.

From September of 2006 until May of 2008, plaintiff was disciplined on a number of occasions for use of sick leave. Although plaintiff was not seeing a doctor and did not have a formal diagnosis, she informed her supervisors that she was suffering from migraines and sleep problems. She claimed that she only was taking time off when her condition left her too fatigued to work. Plaintiff's supervisors did not believe plaintiff and continued to reprimand her. In October of 2006, plaintiff grieved certain disciplinary actions concerning her use of sick time. In

July of 2007, an arbiter found for defendant and determined that plaintiff had been abusing her sick leave.

In May of 2008, plaintiff applied for leave under the Family Medical Leave Act ("FMLA"). She again informed her supervisors of her headaches and difficulty sleeping and the effect they had on her ability to perform her job. Prior to her application, defendant had not 1) made plaintiff aware of the FMLA, 2) given her information about it or 3) posted FMLA information anywhere in the workplace. The day plaintiff applied for FMLA leave, (Can't Find Title) Charles Dominick ("Dominick") told her that it was very "convenient" that she was bringing her paper work in and that the issue "was not over."

Before she applied for FMLA leave, plaintiff was disciplined for two significant events. On February 12, 2008, plaintiff was suspended for three days for failure to see a child in a shelter and failure to obtain treatment for the child's wisdom teeth. Plaintiff grieved this suspension, but the arbiter found that it was just. Plaintiff did not appeal. On February 15, 2008, plaintiff was disciplined for failure to notify her supervisor in a timely manner. A youth in plaintiff's care gave birth and plaintiff did not immediately notify her supervisor. However, there was nothing in the applicable regulations or defendant's policies that stated immediate notification was required.

In 2008, plaintiff also was disciplined for 1) failing to see or make contact with children, 2) conducting unannounced visits without approval, 3) filing a petition in an untimely manner and 4) taking time off in violation of defendant's attendance policy. She also was disciplined for failure to have a father participate in developing a family service plan.

In January of 2009 plaintiff was diagnosed with lupus. She informed her immediate supervisor Michele Bianco ("Bianco") and Dominick and handed a doctor's note to department

administrator Charles McCallen ("McCallen"). Plaintiff also requested help from other caseworkers in completing her work and conducting visits, which was common practice within the office. Bianco refused the request without explanation.

Around this time the harassment directed at plaintiff increased. Bianco changed plaintiff's schedule and the way rules were being applied to plaintiff. Paperwork was returned to plaintiff the day it was due, requiring her to correct it and turn it in late. Client visits were rescheduled for times when plaintiff was unavailable. Plaintiff's dictation was required to be caught up within the day while other caseworkers were given a month. Sometimes plaintiff was permitted to use her discretion in conducting unannounced visits and other times she was required to obtain approval.

Plaintiff's supervisors also questioned the legitimacy of her illness. Bianco constantly told plaintiff that she was not sick and that she should find a job that she was able to perform. Dominick harassed plaintiff about her use of sick time despite the fact that she provided him with doctor's notes, MRIs and pill bottles. On one occasion plaintiff overheard Bianco and McCallen trying to figure out how to write her up.

In August of 2009, plaintiff was hit from behind by another motorist. She suffered a cervical strain and her symptoms related to her lupus seemed to worsen. In September of 2009, she was diagnosed with jamais-vu.[1]

On September 29, 2009, plaintiff received a letter from Bianco directing her to work past 4:00 pm in order to see her clients.[2] Plaintiff again asked for help from other caseworkers. She also asked to see children earlier instead of flexing her time past 4:00 p.m. Both requests were

---

[1] Jamais-vu is a medical condition where a person forgets what they are doing or where they are without losing consciousness. Plaintiff experienced this while driving and watching television.
[2] Prior to 2009 and until the change of plaintiff's schedule in March of 2010, plaintiff's work schedule was consistently 8:30 am – 4:00 pm.

denied.

On February 5, 2010, plaintiff received another letter indicating a change in scheduling. It stated that plaintiff's schedule would be changed from 8:30 a.m. – 4:00 p.m. to 10:30 a.m. – 6:00 p.m. if she did not see all of her clients within the first two weeks of the month. Plaintiff informed her superiors that she could not work past 4:00 p.m. due to her condition. She had tried to work past 4:00 p.m. for a year but her illness left her sore, tired and falling asleep at the wheel. She also told her supervisors that working past 4:00 p.m. prevented her from taking her medication.

On February 16, 2010, plaintiff provided a doctor's that stated she could not work more than 37.5 hours per week. Plaintiff's doctor thought that plaintiff's schedule was 8:30 am – 4:00 pm and did not know that caseworkers could be required to flex their time during the week. Thus, he thought the note was sufficient to prevent plaintiff from working past 4:00 p.m.

Plaintiff was never informed that the note was insufficient to excuse her from working past 4:00 p.m. She offered to start her day earlier and meet children before school. She was told that this was unacceptable and that the morning was not the best time to meet children. However, other caseworkers were permitted to make morning visits.

Plaintiff was able to see all but one of her clients in the first two weeks in March of 2010. Plaintiff scheduled a visit for that client later in the month. On March 12, 2010, plaintiff, Bianco, McCallen, Dominick and Saveikis met to discuss plaintiff working past 4:00 p.m. During this conference plaintiff's longtime schedule of 8:30 am – 4:00 pm was changed to 10:30 am – 6:00 pm. Towards the end of the conference, Dominick slammed his hands on the table, got in plaintiff's face and screamed at her. After the conference plaintiff had a nervous breakdown.

On March 16, 2010, plaintiff contacted Dr. Berger and was given a doctor's note indicating she was unable to return to work for ten days. Thereafter, she was referred to a therapist for a psychiatric evaluation. Plaintiff was diagnosed with major depression and given a doctor's note by Dr. Hauber that stated she could not return to work until further notice. Plaintiff was told that if she returned to work she would be committed due to her nervous breakdown and building anxiety/depression.

Between the March 12, 2010 conference and plaintiff's diagnosis of major depression, a client complaint was filed against plaintiff charging her with being unprofessional, failing to communicate with the family and refusing to meet children when they were off from school. Bianco was the supervisor who received and processed the complaint. Bianco previously had said that the client was impossible to please and made other comments about the difficulty of working with the client.

On April 6, 2010, plaintiff filed for indefinite leave under the FMLA. Her FMLA leave was approved from March 25, 2010 until June 7, 2010 and then from June 8, 2010 until July 23, 2010. On May 5, 2010, plaintiff applied for Social Security Disability. In June of 2010, plaintiff was hospitalized with Legionnaires disease, pneumonia and sepsis. On July 7, 2010, plaintiff applied for indefinite medical leave commencing on July 26, 2010. On July 26, 2010, plaintiff retired from her employment based on a disability.

## McDonnell-Douglas Standard

Plaintiff seeks to prove her claims under the FMLA, ADA and the PHRA through use of indirect evidence. It is well-settled that claims of discrimination based on circumstantial evidence are to be evaluated at summary judgment using the shifting burdens of proof initially established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

St. Mary Honor Center v. Hicks, 509 U.S. 502, 506 (1993); Waldron v. SL Industries, Inc., 56 F.3d 491, 495 (3d Cir. 1995) (citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)); see also Olson v. General Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996) ("It is axiomatic that the familiar analytical framework first pronounced in McDonnell Douglas,…also guides an analysis of claims brought under the ADA.").  Under this framework the parties' respective evidentiary burdens have been summarized as follows:

> First, the plaintiff has the burden of proving by
> the preponderance of the evidence a prima facie case of
> discrimination. Second, if the plaintiff succeeds in proving
> the prima facie case, the burden shifts to the defendant to
> articulate some legitimate, nondiscriminatory reason
> for the [adverse employment action]. Third, should the
> defendant carry this burden, the plaintiff must then have
> an opportunity to prove by a preponderance of the evidence
> that the legitimate reasons offered by the defendant were
> not its true reasons, but were a pretext for discrimination.

Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981) (citation omitted).

Under the indirect evidence approach a plaintiff must present a prima facie case of discrimination.  Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997).  The major purpose of the prima facie case is to eliminate the most obvious lawful explanations for the defendant's adverse employment action and raise a presumptive inference of discrimination. Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 352 (3d Cir. 1999) (citing Burdine, 450 U.S. at 253-54 ("[t]he prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection.")).  A prima facie case raises an inference of discrimination because the presumed circumstances, if left unexplained, indicate it is likely that the defendant's actions were based on consideration of impermissible factors.  Id.  (quoting Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1978)).

There is no talismanic formula for presenting a prima facie case. Jones v. School District of Philadelphia, 198 F.3d 403, 411 (3d Cir. 1999) ("the elements of a prima facie case depend on the facts of the particular case"). The relevant inquiry is whether the plaintiff has suffered an adverse employment action under circumstances which raise an inference of unlawful discrimination. Waldron, 56 F.3d at 494. Plaintiff's burden at this step is "minimal" and is viewed as a means of presenting a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. Id.; *see also* Furnco, 438 U.S. at 577.

If the plaintiff presents a prima facie case, the second stage of the McDonnell Douglas paradigm requires the defendant to articulate a legitimate explanation for the adverse employment action. Keller, 130 F.3d at 1108. The defendant's burden at this step is one of production, not persuasion, and the court's consideration of it "can involve no credibility assessment." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993). If the defendant meets this burden, the presumption of discrimination created by the prima facie case "drops" from the case. St. Mary's Honor Center, 509 U.S. at 511; Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000).

Once the defendant has met its burden of production and provided a legitimate explanation for its adverse employment action, the court's analysis turns to the third and final step of the inquiry, which is usually the most critical in resolving a motion for summary judgment. Jones, 198 F.3d at 410. At this juncture the plaintiff must be afforded the "opportunity to [present evidence that is sufficient to] prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253. At trial, the plaintiff must have evidence that

could convince the finder of fact "both that the [defendant's] reason was false, and that discrimination was the real reason." St. Mary's Honor Center, 509 U.S. at 515. This is because while the burden of production under the McDonnell Douglas analysis shifts, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Jones, 198 F.3d at 410 (quoting Burdine, 450 U.S. at 252-53 (1981)).

"To discredit the employer's proffered reason ... the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765. Instead, the plaintiff must come forward with evidence that demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." Id. (citations omitted). In meeting this burden the plaintiff need not cast doubt on every explanation advanced by the defendant, but rather is only required to present sufficient evidence from which a factfinder reasonably could infer that each of the employer's proffered non-discriminatory reasons is unworthy of credence. Id. at 764. For example, "[i]f the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder." Id. at 764 n. 7. "That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available." Id.

**FMLA Retaliation Claim**

Plaintiff has produced sufficient evidence to survive defendant's motion for summary judgment. First, plaintiff has set forth a prima facie claim for retaliation. To assert a prima facie retaliation claim under the FMLA, a plaintiff must demonstrate that: (1) he or she is protected under the FMLA, (2) he or she suffered a materially adverse employment action, and (3) the materially adverse action was causally related to the plaintiff's exercise of his or her FMLA rights. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146-47 (3d Cir. 2004); Hare v. Potter, 220 Fed. Appx. 120, 127 (3d Cir. 2007).[3] Plaintiff's retaliation claim is controlled by the three-step burden shifting McDonnell Douglas analysis, as outlined above. See Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006) ("If the employee establishes this prima facie case of retaliation, the familiar McDonnell Douglas approach applies.").

In Burlington Northern, the Supreme Court clarified that anti-retaliation provisions are not coterminous with anti-discrimination provisions and thus, are not limited to "workplace-related or employment-related retaliatory acts and harm." Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006). Furthermore, anti-retaliation provisions are not to be construed as "forbidding the same conduct prohibited by . . . antidiscrimination provision[s]." Id. "Consistent with this view, the Court held that a plaintiff claiming retaliation . . . must show that a reasonable employee would have found the alleged retaliatory actions materially adverse." Moore, 461 F.3d at 341 (quotations omitted).

Retaliatory actions are "materially adverse" if they would have the effect of "dissuad[ing] a reasonable worker" from exercising his or her rights. Burlington, 548 U.S. at 68 (what is

---

[3] A number of courts within the Third Circuit have agreed that the legal framework established in Title VII retaliation claims applies to the analysis of FMLA retaliation claims. Mascioli v. Arby's Restaurant Group, Inc., 610 F. Supp.2d 419, 433 (W.D. Pa 2009); Curcio v. Collingswood Bd. Of Educ., No. Civa 04-5100, 2006 WL 1806544 at *11 (D.N.J. 2006).

materially adverse "often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed"); Moore, 461 F.3d at 341. As materially adverse actions can take the form of retaliatory harassment, it is necessary to look at the overall scenario and imperative that individual incidents are not isolated. Hare, 220 Fed. Appx. at 132; Jensen v. Potter, 435 F.3d 444, 450 (3d. Cir. 2006).

Materially adverse actions also must be linked to a retaliatory animus directed at the plaintiff's engagement in a protected activity. Thus, the record must contain sufficient evidence from which the finder of fact can link the materially adverse action to a retaliatory animus. Moore, 461 F.3d at 342. Two central factors are brought into play: (1) the temporal proximity between the protected activity and the alleged retaliation and (2) the existence of any pattern of antagonism in the intervening period. Jensen, 435 F.3d at 450 (quoting Abramson v. William Paterson Coll. Of Jew Jersey, 260 F.3d 265 288 (3d Cir. 2001) (quoting Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997))). "Timing alone raises the requisite inference when it is unusually suggestive of retaliatory motive." Id. (internal quotations omitted). "But even if temporal proximity is missing, [it is appropriate to] look to the intervening period for other evidence of retaliatory animus." Id. (quoting Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir.1997)) (internal alterations omitted). However, "these are not the exclusive ways to show causation" and it is important to consider all of the proffered evidence as a whole to determine whether it "may suffice to raise the inference." Id. (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000) and citing in support Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 178 (3d Cir.1997) ("The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context specific.").

Neither party disputes that plaintiff is protected under the FMLA. Rather, the parties dispute whether plaintiff suffered a materially adverse action and whether that action can be linked to retaliatory animus.

Defendant's assertion that plaintiff did not suffer a materially adverse action is unconvincing. A reasonable jury could find that the numerous employment actions levied against plaintiff after she applied for FMLA leave were sufficient to create an overall scenario that would dissuade a reasonable worker from exercising her rights. Plaintiff's schedule was altered, requiring her to meet with clients at times when she was unavailable. She was expected to keep her case files updated by the day while other caseworkers were given a month. Plaintiff was prohibited from having co-workers assist her in completing her work even though this was a common practice within the workplace. Plaintiff's immediate supervisors (mainly Bianco and Dominick) harassed her about missing work and told her to quit and find a job she could perform. Finally, her longtime schedule was changed, requiring her to work until 6:00 p.m. Taking all of these events in their totality, a reasonable jury could find that plaintiff was subject to materially adverse employment.

Similarly, defendant's argument that the materially adverse action(s) cannot be linked to retaliatory animus is unpersuasive. In her deposition plaintiff alleged that Dominick remarked about the convenience of plaintiff's FMLA application. At that time he also assured plaintiff that the issue concerning her use of sick time was not closed. Because this incident directly related to plaintiff's use of FMLA leave, it raises an obvious inference of retaliatory animus.

Furthermore, plaintiff was never made aware of the FMLA and before her utilization of its protection she frequently was disciplined for taking sick leave despite the fact that she informed her supervisors about her condition. When Dominick's comments are taken in

conjunction with the special treatment plaintiff received after her application for FMLA leave and the fact that her utilization of the FMLA disposed of a mode of discipline previously used against her, a jury could find that plaintiff was treated more adversely than she otherwise would have been because she exercised her rights under the FMLA. Thus, plaintiff has produced sufficient evidence to establish a prima facie case.

In turn, defendant has produced sufficient evidence to satisfy the second prong of the McDonnell Douglas test. Defendant claims that plaintiff was missing visits, making unannounced home visits when no one was present at the client's home and falling behind with her dictation. Thus, it was necessary to monitor plaintiff closely and change her schedule in order to ensure that she was seeing all of her clients and completing all of her work. As the defendant's burden is only one of production and not persuasion, defendant has satisfied the second prong.

Finally, plaintiff has fulfilled her burden of production under the third prong of the McDonnell-Douglas paradigm. Plaintiff has proffered evidence of pretext. First, she has shown that the disciplinary and remedial measures aimed at her were not applied to others within the office. For example, other caseworkers were permitted to conduct unannounced visits when schools were not in session, but when plaintiff conducted such visits she was disciplined. Plaintiff was singled out with regard to her dictation and quality of paperwork. Plaintiff testified that all persons within the office had trouble keeping up with their dictation and enjoyed latitude as to the types of grammatical errors that were accepted within documents. After invocation of her rights under the FMLA plaintiff was the only employee required to keep her dictation up to date on a daily basis and was sometimes returned paperwork on the day it was due, requiring her to turn the corrected copies in late.

Second, plaintiff has made a showing that the changes in her schedule could be found to be inconsistent with logic. It was well documented that plaintiff was having trouble seeing clients. If plaintiff already was having trouble scheduling visits and improperly was relying on unannounced visits, it can be assumed that a reasonable supervisor would encourage her to schedule the visits. Instead, Bianco made it more difficult for plaintiff to do just that by altering plaintiff's schedule. Thus, Bianco's rescheduling of plaintiff's visits to times when she was unavailable could be found to be non-sensical.

Furthermore, plaintiff's longtime schedule adversely was changed to require her to work until 6:00 p.m. Defendant argues that this change was necessary because plaintiff was still failing to see her children. However, plaintiff testified that within the first two weeks of March she had seen all of her children but one and thus had remedied the very shortcoming the scheduling change purportedly was designed to resolve.

The above evidence sufficiently demonstrates weaknesses and inconsistencies in defendant's proffered reasons for its actions. Although all employees had trouble maintaining their case files, plaintiff was singled out and closely monitored. She also was singled out for special treatment in that she was forced to obtain approval from supervisors to conduct unannounced home visits when other caseworkers were not under similar circumstances. Finally, the change in plaintiff's schedule could be found to be unneeded or at least extreme as she evidently had remedied her shortcomings in failing to see her clients.

Defendant has failed to produce any evidence that undercuts plaintiff's testimony as a matter of law. Defendant has produced no evidence that shows other similarly situated caseworkers were treated in a comparable way. Nor has it produced evidence that shows that 1) other caseworkers were required to obtain permission to conduct unannounced visits and were

disciplined when they did not, 2) other caseworkers who were behind in their dictation were closely monitored and required to keep their dictation up to date on a daily or even weekly basis, 3) other caseworkers schedules were changed so as to pull them from previously scheduled visits or 4) other caseworkers who failed to see children had their schedules closely monitor and changed so as to remedy the failure.

Furthermore, defendant has not justified its refusal to allow plaintiff the help of others in completing her work even though this was the generally accepted practice within the office. Defendant also has failed to displace the probative effect of the comments from Bianco and Dominick following her application for FMLA leave. Defendant merely engages in a "he said, she said" with plaintiff, claiming that these events never occurred. At this juncture, plaintiff's testimony must be taken as true. Accordingly, defendant's motion for summary judgment must be denied on this count.

## ADA and PHRA Discrimination

Plaintiff has adduced sufficient evidence to create a genuine issue of material fact with respect to her claim for discrimination under the ADA and PHRA.[4] The ADA proscribes "discrimination against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual" means a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §12111(8); Buskirk v. Apollo Metals,

---

[4] PHRA claims are analyzed under the same framework as ADA claims. See Taylor v. Phoenixville School Dist., 184 F.3d 296 (3d Cir. 1999). Thus, only plaintiff's ADA claims will be discussed.

307 F.3d 166, 168 (3d Cir. 2002). A "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual, (B) a record of such impairment; or (C) being regarded as having such an impairment." Id. at § 12102(1).

In order for a plaintiff to establish a prima facie case of discrimination under the ADA, the plaintiff must show that he or she: (1) is a disabled person within the meaning of the ADA; (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) has suffered an otherwise adverse employment decision as a result of discrimination. See Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999); Deane v. Pocono Medical Center, 142 F.3d 138, 142 (3d Cir. 1998). The refusal to make reasonable accommodations for a plaintiff's disabilities constitutes as an adverse employment decision. Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 761 (3d Cir. 2004). Constructive discharge can also constitute as an adverse employment decision. Suders v. Easton, 325 F.3d 432, 447 (3d Cir. 2003).

Defendant contends that none of the above elements are met and plaintiff's attempt to show a prima facie case of discrimination is an utter failure. Thus, an examination of each element is warranted.

Plaintiff has proffered sufficient evidence from which a reasonable jury could find she falls under the protection of the ADA. To invoke the protection of the ADA, a plaintiff must show that she suffers from 1) an impairment, 2) that the impairment limits a major life activity and 3) the limitation is substantial. 42 U.S.C. §12102 (1)(A); Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 194-95 (2002). "A major life activity is one of central importance such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing,

learning and working, as well as sitting [and] standing." Kania v. Potter, 358 Fed. Appx. 338,

342 (3d Cir. 2009) (internal quotations and citations omitted). "Substantially limit[ed]" has been

defined as the inability "to perform a major life activity that the average person in the general

population can perform or significantly restricted as to the condition, manner or duration under

which the average person in the general population can perform that same major life activity."

Toyota, 534 U.S. at 195-96 (2002) (quoting 29 C.F.R. §1630.2(j) (2001) (internal quotations and

alterations omitted). Although an impairment must substantially limit a major life activity, it

need not "limit other major life activities in order to be considered a disability." 42 U.S.C.

12102 (4)(C). Furthermore, an impairment that is episodic or in remission need not have a

permanent or long term impact to be considered a disability if it "substantially limit[s] a major

life activity when it is active." Id. at 12102(4)(D); accord Britting v. Secretary, Dept. of

Veterans Affairs, 409 Fed. Appx. 566, 568 (3d Cir. 2011).

A plaintiff that seeks to prove a disability must set forth evidence that shows that her

impairment, in terms of her own experience, is substantial. Toyota, 534 U.S. at 198. Thus, the

determination of whether a plaintiff has a disability is to be determined on a case-by-case basis

and "an individualized assessment . . . is particularly necessary when the impairment is one

whose symptoms vary widely from person to person." Id. at 198-99.

Medical testimony is not necessarily required to establish a disability. Marinelli v. City

of Erie, 216 F.3d 354, 360 (3d Cir. 2000) (citing Katz v. City of Metal Co., 87 F.3d 26, 32 (1st

Cir. 1996)). If an impairment is one that is "amenable to comprehension by a lay jury," failure to

present medical evidence in support of it is not dispositive. Marinelli, 216 F.3d at 360.

Defendant's argument that plaintiff does not qualify as disabled under the ADA is wide

of the mark. Plaintiff has established her existing impairment through her 2008 FMLA

application, her diagnosis of lupus in 2009 and her deposition testimony. Plaintiff's 2008 FMLA application stated she was unable to perform her job when she was suffering from the effects of her migraine headaches and sleep apnea. Thus, plaintiff's FMLA application indicates that plaintiff's impairment substantially affected major life activities such as sleeping and concentrating as her condition affected her sleep and left her fatigued and unable to work.

Plaintiff testified that her migraines and sleep problems were diagnosed as symptoms of lupus. When these symptoms were present she had difficulty sleeping, concentrating, thinking and driving. Defendant alludes to the proposition that lupus is a technical medical disease that is not amenable to the understanding of a lay jury. Nevertheless, the symptoms of the disease are things many people struggle with from time to time. Thus, the production of medical evidence beyond what is already in the record is not required. In short, plaintiff has produced medical evidence that shows she was suffering from a substantial impairment in 2008 and in 2009 these symptoms were officially diagnosed as the manifestations of lupus. Because a reasonable jury could find that plaintiff suffered from a substantial impairment there is a genuine issue of material fact as to whether she was disabled under the ADA.

Similarly, defendant's argument that plaintiff is not a qualified individual is unavailing. The determination of whether an individual with a disability is qualified is made at the time of the employment decision; not at the time of the lawsuit. Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998). The Interpretive Guidance to the EEOC Regulations preface the inquiry of whether an individual is "qualified" with two threshold questions: (1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position; and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position. 29 C.F.R. § 1630.2(m); see also Buskirk v.

Apollo Metals, 307 F.3d 160, 168 (3d Cir. 2002).

The determination of whether an individual can, with or without reasonable accommodation, perform the essential functions of the position also involves a two-step process. Deane v. Pocono Medical Center, 142 F.3d 138, 146 (3d Cir. 1998). As the court in Deane explained, "[f]irst, a court must consider whether an individual can perform the essential functions of the job without accommodation. If so, the individual is qualified (and, *a fortiori*, is not entitled to accommodation). If not, then a court must look to whether the individual can perform the essential functions of the job with a reasonable accommodation. If so, the individual is qualified. If not, the individual has failed to set out a necessary element of the prima facie case." Id.

The parties do not dispute plaintiff's general qualifications as a caseworker. Rather, they dispute whether plaintiff was able to perform the essential functions of her position. Defendant apparently argues that plaintiff could not perform the essential functions of her position and that any of plaintiff's requests/proposed accommodations would have eliminated these functions. In response, plaintiff argues that her requests/proposed accommodations would have kept the essential functions of her job intact. Thus, an examination of what the essential functions of plaintiff's job were and what constitutes as a reasonable accommodation is warranted.

First, it is well established that "[w]hether a particular function is essential 'is a factual determination that must be made on a case by case basis [based upon] all relevant evidence.'" Turner v. Hershey Chocolate U.S., 440 F.3d 604, 612 (3d Cir. 2006) (quoting Deane, 142 F.3d at 148); see also Skerski v. Time Warner Cable Co., 257 F.3d 273, 279 (3d Cir. 2001) (same). Whether a job duty is an "essential function" turns on whether it is "fundamental" to the employment position. 29 C.F.R. § 1630.2(n)(1); Turner, 440 F.3d at 612 (quoting 29 C.F.R.

§1630.2(n)(1)).  The term "essential function" does not include the "marginal" functions of the

position.  Id. at § 1630.2(n)(1).  A job function may be considered essential for any of several

reasons, including but not limited to:

      (i)     The function may be essential because the reason the position exists is to perform that function;

      (ii)    The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

      (iii)   The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

Id. at § 1630.2(n)(2).  Evidence of whether a particular function is essential can include but is not

limited to:

      (i)     The employer's judgment as to which functions are essential;

      (ii)    Written job descriptions prepared before advertising or interviewing applicants for the job;

      (iii)   The amount of time spent performing the function;

      (iv)   The consequences of not requiring the incumbent to perform the function;

      (v)    The terms of a collective bargaining agreement;

      (vi)   The work experience of past incumbents in the job; and/or

      (vii)  The current work experience of incumbents in similar jobs.

Id. at (n)(3).

     Plaintiff was hired and her position as a caseworker was specifically created to 1) ensure

the safety of her client children, 2) investigate allegations of child abuse and neglect and 3) take

appropriate action to protect the safety and welfare of the children.  A number of activities are

listed under the "Essential Duties and Responsibilities" section of the "Position Description"

form for caseworkers of Westmoreland County.  These include: conducting home visits and

parent and child interviews; investigating allegations of neglect, abuse and other complaints and determining whether there is the need for protective services; maintaining contact with service providers; preparing court petitions and motions; testifying at hearings and maintaining case records.

In short, although there are a number of actions that can be found to be essential functions of plaintiff's job, the primary essential function appears to be ensuring the safety of the client children. Under this concept lies a number of actions that are essential to the actuation of the overall goal and thus these actions also should be considered as essential to plaintiff's job. Such actions necessarily would include visiting clients and making contact with their environment to determine if they are in fact safe as well as working closely with the families of the children to ensure that they are not being neglected or abused.

Defendant argues that plaintiff was unable to see all of her clients and thus was unable to ensure that the children were receiving proper care. Thus, plaintiff was unable to perform the essential functions of her job. Plaintiff claims she would have been able to perform her duties adequately with the support of her coworkers and modifications to her schedule.

With this backdrop in mind, an analysis of what constitutes as a reasonable accommodation is necessary to determine if the above duties and responsibilities could have been accomplished through plaintiff's requests. A "reasonable accommodation" includes:

> Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B).

The regulations define reasonable accommodations as "[m]odifications or

adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. §1630.2(o)(1)(ii). "[T]he question of whether a proposed accommodation is reasonable is a question of fact." <u>Buskirk</u>, 307 F.3d at 170; <u>see also</u> <u>Skerski v. Time Warner Cable Co., a Div. of Time Warner Entertainment Co., L.P.</u>, 257 F.3d 273, 286 (3d Cir. 2001); <u>Turner v. Hershey Chocolate U.S.</u>, 440 F.3d 604, 614 (3d Cir. 2006) ("As with the issue of 'essential function,' the issue of 'reasonable accommodation' presents a fact question.").

The employee must make a facial showing that his or her proposed accommodation was possible. If that showing is made, the burden shifts to the employer to prove the affirmative defense that the requested accommodation was unreasonable or would have placed undue hardship on the employer. <u>Turner</u>, 440 F.3d at 614 (citing <u>Gaul</u>, 134 F.3d at 580). The plaintiff is required only to identify an accommodation where the costs do not clearly exceed its benefits on its face. <u>See</u> <u>Walton v. Mental Health Ass'n of Southeastern Pa.</u>, 168 F.3d 661, 670 (3d Cir. 1999). A grant of summary judgment for a defendant is appropriate only "in cases in which plaintiff's proposal is either *clearly ineffective* or *outlandlishly* costly." <u>Id.</u> at 670 (quotation omitted) (emphasis added).

Plaintiff requested that 1) her fellow coworkers be allowed to help her complete her work and 2) she be allowed to see children in the morning so that she would not have to work past 4:00 p.m. She has testified that caseworkers regularly helped each other and defendant has produced no evidence to the contrary. Furthermore, defendant has not shown why this

presumably common practice was unreasonable and how it would otherwise interfere with ensuring the safety of plaintiff's clients.

Plaintiff also testified that her client's families were open to plaintiff meeting their children in the morning. Plaintiff has produced evidence that the accommodation was viable. She had utilized the approach for a lengthy period prior to the events giving rise to this suit and in March she was able to see all but one child in the first two weeks of the month.

Defendant merely posits that plaintiff had to see children after 4:00 pm or she would not be able to perform an essential function of her job, namely ensuring that her clients were safe. However, in order to prevail on this affirmative defense defendant must do more than simply assert in a conclusive fashion that an accommodation is unreasonable or that it eliminates an essential function of the job.

Plaintiff has made a prima facie showing that her proposed accommodations were possible. Defendant has failed to meet its burden. Thus, a genuine issue of material fact exists with respect to whether plaintiff's requested accommodations were reasonable.

Moreover, since plaintiff's requested accommodations could be considered to be reasonable and a jury could find that these accommodations would enable her to perform the essential functions of her job, a reasonable jury could also find that plaintiff was a qualified individual under the ADA. Thus, a genuine issue of material fact exists as to the second element of plaintiff's claim.

Defendant also argues that the third element of plaintiff's ADA discrimination claim is deficient. According to defendant, plaintiff never asked for a reasonable accommodation and never informed it of her disability. Thus, defendant assuredly did not deny plaintiff a reasonable accommodation.

Defendant's argument is misplaced. Under the ADA, adverse employment decisions "include refusing to make reasonable accommodations for a plaintiff's disabilities." Williams, 380 F.3d at 761. Notice of an employee's request for an accommodation must be clear in that "the employee wants assistance for his or her disability. In other words, the employer must know of both the disability and the employee's desire for accommodations for that disability." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 314 (3d Cir. 1999).

Formalisms and the manner of request are irrelevant. Id. at 313. What matters is that the employee provide sufficient information so that the employer is put on notice of both the disability and the requested accommodation(s). Id. Where an employee has notified the employer of a desire for an accommodation, the employer "cannot escape his duty to engage in the interactive process simply because the employee did not come forward with a reasonable accommodation that would prevail in litigation." Id. at 317. Thus, "both parties have a duty to assist in the search for the appropriate reasonable accommodation and to act in good faith." Id. at 312.

"An employee can demonstrate that an employer breached its duty to provide reasonable accommodations because it failed to engage in good faith in the interactive process by showing that: '1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.'" Williams, 380 F.3d at 772 (quoting Taylor, 184 F.3d at 317).

In Taylor, the plaintiff did not formally notify the defendant of her disability. The plaintiff became psychotic at work, the school district knew she was hospitalized pursuant to this

psychotic break and the hospital provided the school district with a number and was directed to call if it had questions.  Id. at 313-14.  Furthermore, the school district required the plaintiff to submit a note from her doctor but knew of plaintiff's requirement to be on medication for her illness.  Id.  The Third Circuit held that this was more than enough to put the school district on notice and that the plaintiff only had to request an accommodation to trigger the defendant's burden of interaction.  Id.

Here, defendant's argument boils down to the fact that plaintiff never used the words "disability" or "accommodation" when she informed it of her impairment and/or asked for assistance with the difficulty she was having at work.  Plaintiff provided defendant with an FMLA application that emphasized the severity of her impairment in 2008.  Prior to 2008, plaintiff had informed defendant of her migraine headaches, sleep apnea and fatigue for several years.  Defendant knew of plaintiff's lupus diagnosis in 2009.  Given the totality of the circumstances, a reasonable jury could determine that at the latest defendant was put on notice of plaintiff's disability in or around late 2008 or early 2009.  Thus, a reasonable jury could also find that if plaintiff requested an accommodation at this time defendant bore a burden of helping plaintiff determine what accommodations would be reasonable.

There also is sufficient evidence to support the contention that plaintiff asked for an accommodation and defendant did not make a good faith effort to assist her.  Id. at 314.  It is undisputed that plaintiff asked to work earlier instead of later.   Plaintiff testified that she asked to work earlier due to the severity of her impairment and the difficulties it created.  For example, due to the fatigue and pain that grew worse as the day wore on, plaintiff testified that she would fall asleep at the wheel.  Although defendant disputes why plaintiff asked to do her work earlier in the day, a reasonable jury could take her request as one for an accommodation.

At this stage defendant would have had a duty to help plaintiff identify and implement any suitable accommodations. Defendant received a note from plaintiff's physician and plaintiff believed the note was sufficient to excuse her from working past 4:00 p.m. It is reasonable to infer that defendant became aware of plaintiff's belief. If at that juncture defendant believed the note was insufficient, the burden was on it to seek out additional information and act in good faith in relation to plaintiff's requested accommodation. Given the evidence in the record, a reasonable jury could find that defendant failed to meet its obligation as it could have contacted plaintiff's doctor to clear up any ambiguities or asked plaintiff for documentation that would have satisfied defendant. There is no evidence that it did either of these.

Arguing in favor of this course of action, defendant claims that the new schedule was required to ensure the safety of plaintiff's client children. But defendant does not explain or give any reason as to why this was so and/or why it did not work with plaintiff to find a suitable accommodation. The record can be read to support a finding that defendant simply ignored plaintiff's request. As such, when taking all reasonable inferences in plaintiff's favor, a reasonable jury could find that defendant fell short in discharging its duty to engage in the interactive process in good faith and that plaintiff could have been accommodated but for defendant's failure to do so.

Plaintiff also testified that she asked for help from her coworkers. Once again, because a reasonable jury could find that defendant was put on notice of plaintiff's disability, they could also find that defendant failed to meet its burden of good faith negotiation. Defendant has produced little evidence that shows why this request was denied. Furthermore, defendant has produced no evidence to show that it participated in any process to try and accommodate plaintiff in this or any other regard. As such, plaintiff has met the third element of an ADA

disparate treatment claim.

Because a reasonable jury could find that plaintiff was disabled, a qualified person under the ADA, requested an accommodation and was denied that accommodation and defendant has not identified legitimate reasons as to why plaintiff's requested accommodations had to be rejected, defendant's motion for summary judgment with respect to plaintiff's ADA and PHRA discrimination claims must be denied.

## ADA Hostile Work Environment

By the thinnest of reeds plaintiff has produced sufficient evidence to move forward on her claim for hostile work environment. A case for a hostile work environment under the ADA has the following elements: "1) [the plaintiff] is a qualified individual with a disability under the ADA; 2) [he or she] was subject to unwelcome harassment; 3) that harassment was based on [a] disability or a request for an accommodation; 4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive working environment; and 5) that [the employer] knew or should have known of the harassment and failed to take prompt effective remedial action." Barclay v. Amtrak, 435 F. Supp.2d 438, 448 (E.D. Pa. 2006) (quoting Walton v. Mental Health Ass'n of Southeastern Pa., 168 F.3d 661, 667 (3d Cir. 1999)).

In analyzing whether a plaintiff has met its burden, the court cannot confine its analysis to "the individual pieces of evidence alone," but must "view the record as a whole picture." Id. at 276 (citing Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir. 1997)). This is because "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but the overall scenario." Id. (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990)).

First, as noted above, plaintiff has set forth sufficient evidence from which a reasonable jury could find that she was a qualified individual under the ADA. Second, plaintiff has set forth sufficient facts to show that she received unwelcome harassment beginning in the mid-2000s which continued until her retirement in 2010.

Third, plaintiff has produced evidence to show that the harassment was linked to her disability. Prior to plaintiff's FMLA application she was heavily disciplined for her use of sick time. Upon application for FMLA leave in May of 2008, plaintiff was told by Dominick that the issue was not over. Thereafter, plaintiff's schedule was modified, requiring her to work at taxing times, plaintiff was required to obtain approval for all unannounced home visits even though other workers were not, and her paperwork was returned for correction without adequate time to meet deadlines. Bianco constantly questioned the legitimacy of plaintiff's impairment and she with McCallen looked for opportunities to discipline plaintiff. Given these circumstances, a reasonable jury could find that plaintiff was treated disparately because of her disability.

Fourth, although subject to debate, there appears to be sufficient evidentiary basis for a jury to find that the harassment was so pervasive that it altered the conditions of plaintiff's employment. The harassment included constant second guessing of and badgering about the legitimacy of plaintiff's impairment. Plaintiff's schedule was changed to times she was unavailable and her paperwork was returned without sufficient time to meet deadlines. Plaintiff was not afforded help from her fellow case workers despite the fact that it was common place to receive assistance. Plaintiff repeatedly was reprimanded for failing to keep her dictation up to date even though this problem was widespread throughout her department. Finally, plaintiff's schedule was changed even after she remedied the underlying deficiency and then was verbally accosted by Dominick. When these facts are viewed in their totality, a reasonable jury could find

that the harassment altered the conditions of plaintiff's employment and created an abusive work environment.

Finally, when the facts are read in the light most favorable to plaintiff, a reasonable jury could find that her employer knew of the harassment and the harassment culminated in a tangible change in the terms of employment. Plaintiff testified that she told Bianco, Saveikis and McCallen to stop the harassment because the increased stress worsened her illness. Plaintiff also made her supervisors aware of her illness by providing doctor's notes, MRIs and pill bottles as wells as documentation regarding medical leave. Plaintiff explained that working past 4:00 p.m. was too difficult given her impairment and its seriousness. Despite all of this, the harassment continued and plaintiff's schedule was changed. It continued to the point where plaintiff had a nervous breakdown. Given these facts and the ones outlined above, the finder of fact can conclude that the employer was on notice of the harassment and failed to take appropriate remedial action. See Griffin v. Harrisburg Property Servs. Inc., 421 F. App'x. 204, 208 (3d Cir. 2011) (Where harassment that constitutes a tangible employment action occurs at the hands of managers or supervisors, knowledge of their conduct is imputed to the employer and the fifth element is satisfied.); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998) (A tangible employment action is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." It likewise may be established by demonstrating a materially adverse change based upon other indices that are unique to the particular situation.) (citing with approval Crady v. Liberty National Bank & Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir.1993)); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998)); Harris v. Forklift Systems, Inc., 510 U.S. 17, 22 (1993) (protection under remedial

statutes prohibiting discrimination come into play well before the harassing conduct leads to a nervous breakdown).

Defendant argues that the actions described above were legitimate because plaintiff was not performing the fundamental functions of her job. However, a reading of the record pursuant to the summary judgment standard precludes this assertion. If plaintiff remedied her shortcoming by timely seeing children pursuant to a schedule that did not require her to work past 4:00 pm, it is difficult to see how changing her schedule to require her to work until 6:00 pm was truly warranted. Defendant also fails to explain how returning paperwork for revisions the day it is due was a legitimate exercise of remedial discipline. Furthermore, reprimanding plaintiff for actions that other employees were permitted to engage in cannot be found to be a legitimate use of disciplinary authority as a matter of law.

When all reasonable inferences are drawn in plaintiff's favor, these actions taken together could be found to have altered the conditions of plaintiff's employment. Plaintiff's job was made more difficult and frustrating through the actions of her supervisors. Plaintiff was required to work a revised schedule that was known to be very difficult for her given her impairment. She also was subject to constant harassment about her illness. As plaintiff has produced sufficient evidentiary material to support her claim of a hostile work environment, defendant's motion must be denied.

### Constructive Discharge

Plaintiff's claim for constructive discharge also survives defendant's motion for summary judgment. To sustain a constructive discharge claim, a plaintiff must present evidence from which the finder of fact can conclude that the "working conditions were so intolerable that a reasonable person would have felt compelled to resign." Pennsylvania State Police v. Sunders,

542 U.S. 129, 131 (2004). "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." Hill v. Borough of Kutztown, 455 F.3d 225, 233 n.7 (quoting Pennsylvania State Police, 542 U.S. at 14). "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" Id. Factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Systems, Inc., 510 U.S.17, 23 (1993). Of course, the analysis also focuses on the "totality of the circumstances," as no one factor is determinative. Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990).

In this case a genuine issue of material fact exists as to whether plaintiff was subjected to a hostile work environment. Thus, a reasonable jury could find that plaintiff had to endure an abusive work environment and that the harassment became severe and pervasive. For plaintiff to sustain her cause of action for constructive discharge she must further show that the hostile work environment was so intolerable that it would have caused a reasonable person to resign. Plaintiff has met this standard.

Although plaintiff was never threatened with discharge, her immediate supervisor frequently told her to quit and find a job she could handle. Bianco regularly told plaintiff she was tired of plaintiff taking sick time and fed up with doing plaintiff's work. Plaintiff's job responsibilities were altered and her schedule adversely was modified. Normally, this change would be minor, but given the circumstances, it was far from inconsequential. First, the change was unnecessary as plaintiff had remedied the problem by seeing virtually all of her clients in a

timely fashion. Second, given plaintiff's impairment and its severity, the change was dangerous to plaintiff as she had tried to work past 4:00 p.m. for a year and physically was unable to do so.

Not only was plaintiff harassed about her illness, Dominick verbally accosted her after her schedule was changed. This display of anger and intimidation along with the constellation of other incidents can be viewed as a form of constant pressure being placed on plaintiff. Viewing the events in their totality and taking all inferences in plaintiff's favor, a reasonable jury could find that an objective person in plaintiff's position and in her subjective state of body and mind would find her working conditions so intolerable that she had no other option but to quit.

Defendant argues that plaintiff retired because of her mounting illnesses. More specifically, defendant points to plaintiff's hospitalization in July of 2010 with pneumonia, sepsis and Legionnaire's disease and the cognitive problems she was suffering secondary to her car accident. What defendant fails to recognize is that plaintiff did not return to work after her altercation with Dominick on March 12, 2010. Plaintiff testified that she had a nervous breakdown after this event due to the mounting pressure and harassment she was experiencing for numerous years which finally crushed her. Not only does plaintiff proffer this testimony, but defendant's exhibits support her contention. After the incident with Domicick plaintiff went to a therapist and was diagnosed with depression. Plaintiff also testified that her therapist told her that she would be committed if she returned to the workplace and thus she got medical authorization to be excused from work. Given the record and taking all inferences in plaintiff's favor, a reasonable jury could find that plaintiff quit because of the mounting harassment and that an objective person similarly situated would have done the same. Thus, defendant's motion for summary judgment fails on this count.

In conclusion, plaintiff has produced evidence from which a reasonable jury could find

that she has satisfied the requirements for claims of discrimination and hostile work environment under the ADA and PHRA and retaliation under the FMLA. Thus, defendant's motion for summary judgment must be denied on all counts.

Date: March 3, 2014

s/David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:    Adam R. Gorzelsky, Esquire
       Susan N. Williams, Esquire
       Thomas P. Pellis, Esquire
       Bernard P. Matthews, Esquire

       (*Via CM/ECF Electronic Mail*)